UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT A. TAYLOR,

    Plaintiff,

v.

CITY OF CHICAGO,

    Defendant.

No. 13 CV 4597

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Chicago police officers detained Robert Taylor because an investigative alert in the system said there was probable cause to arrest Taylor. But the alert should have been canceled months earlier—he had been acquitted of the charge that led to the alert and there was no basis to detain him. Taylor seeks to hold the City of Chicago liable for his detention under 42 U.S.C. § 1983, but the City's policies or practices were not directly responsible for a constitutional violation here. On this record, Taylor's seizure was a one-time administrative failure to follow a constitutional policy. The City's motion for summary judgment is granted, and Taylor's motion is denied.

## I. Legal Standard

A party moving for summary judgment must show there is no genuine dispute about any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party must demonstrate that, after construing all facts and drawing all reasonable inferences in favor of the nonmovant, *Laborers' Pension Fund*

*v. W.R. Weis Co., Inc.*, 879 F.3d 760, 766 (7th Cir. 2018), a reasonable jury could not return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Or, the moving party must show that the nonmoving party has failed to establish an essential element of his claim and could not carry his burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). These standards apply equally to cross-motions for summary judgment. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). When evaluating cross-motions, I consider evidence from both to ensure there is no material dispute. *Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019).

## II. Background

Plaintiff Robert Taylor sued individual officers involved in the search of his apartment, his arrest on gun charges, and his later detention after his acquittal. [94].[1] He also sued the City of Chicago. *Id.* I bifurcated the individual and municipal claims. [87]. The individual officers moved for summary judgment, and I granted their motion in part. [231].

As described in the first opinion and order, a confidential informant told Chicago police officer Ricky Hughes that Taylor, a convicted felon, had a gun in his apartment. *Id.* at 1. Hughes procured a warrant to search Taylor and the apartment located at 645 West 62nd Street, Apartment 1S. *Id.* But the address of Taylor's

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are from the CM/ECF header placed at the top of documents. Facts are largely taken from responses to the parties' statements of material facts, where the original facts and responses are in one document. [300];[301].

2

apartment, and the one that police actually searched, was 643 West 62nd Street, Apartment 1N. *Id.* After officers searched the apartment and found a gun, an investigative alert based on probable cause was issued for Taylor. *Id.* He was arrested in June 2011, held in custody for several months, and tried for the crime of unlawful use of a weapon. *Id.* The judge made note of the incorrect address on the search warrant, quashed the arrest, and found Taylor not guilty. *Id.*

A few months later, in December 2011, police officers detained Taylor again, acting on the same investigative alert as before, and it took over an hour to clear up the confusion and release him. *Id.*; [301] ¶ 28.

There was probable cause for the search warrant, and it was valid because it was obtained and executed in good faith despite its use of the wrong address. [231]. There was probable cause to arrest Taylor in June 2011, and Taylor could not establish every element of his malicious prosecution claim. *Id.* Consequently, I granted summary judgment in favor of all the individual defendants, except for one count against Detective Joshua Weitzman because a genuine dispute existed as to his responsibility for canceling the investigative alert, which led to Taylor's second arrest in December 2011. *Id.* at 23–24.

The parties then turned to the bifurcated claims against the City of Chicago and filed cross-motions for summary judgment. [287]; [290].[2] The core remaining

---

[2] The partial grant of summary judgment in favor of the individual officers effectively narrowed the scope of Taylor's *Monell* claims, so I limited each party to 40 statements of fact and 20 additional facts. [278]. I prohibited extra pages and restricted reply briefs to eight pages. *Id.* Taylor submitted 47 facts instead of 40. [300]. He filed 40 additional facts—twice the amount allowed—that duplicate facts from his 56.1 statement. [300]; [302]. His reply brief exceeds eight pages. [307]. The City did not respond to Taylor's additional facts, [302],

3

claim is about the Chicago Police Department's investigative alert policy. Before investigative alerts, the CPD implemented a "stop order" policy. [300] ¶¶ 4, 9. A "stop order" alerted officers that 1) an investigating unit wanted to talk to a specific individual if that individual happened to be arrested or 2) an arrest warrant was on file for a particular individual. *Id.* ¶¶ 10–11. The computer record of the arrest warrant automatically expired within a week. *Id.* ¶ 12.

The stop-order policy was replaced by an "investigative alert" policy in March 2001. *Id.* ¶ 9.[3] The policy that was in effect at the time of Taylor's arrest allowed two types of investigative alerts: one with probable cause to arrest and one without. [301] ¶ 11. The alert for Taylor was the former. [300] ¶¶ 35–36. Incorporating a probable-cause determination into the alert system reduced the CPD's need to obtain arrest warrants from judges. *Id.* ¶¶ 17–18. The alerts went into a criminal history records system that police officers used to run background checks. *Id.* ¶ 14. The policy required officers to take any individual with a probable cause alert into custody. *Id.* ¶ 16. An alert could only be entered by a Bureau of Investigative Services member[4]

---

or submit additional facts in response to Taylor's motion. Taylor's seven extra statements of fact, all his additional facts, and the extra pages in his reply brief are stricken, and any argument made in the excess pages is forfeited. *See McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 787 (7th Cir. 2019) ("[W]e have repeatedly held that district judges may strictly enforce local summary-judgment rules."). Taylor's counsel, Irene Dymkar, shall also file a written statement explaining why she should not be sanctioned for not complying with the court order setting the limits on the number of pages and facts.

[3] Although Taylor objects to the City's citation to the Special Order that implemented the investigative alert policy, [301] ¶ 10, Taylor himself cites to the same Special Order, [300] ¶ 3, and there is no dispute that it is a true and accurate copy. I do not address Taylor's other evidentiary objections because they do not concern material facts.

[4] The bureau has now been split into two: Bureau of Detectives and Bureau of Organized Crime. [300] ¶ 13.

that was responsible "for follow-up investigation" and had to be approved by a BIS supervisor. *Id.* ¶ 14. The BIS member and supervisor were not, however, required to be involved in the investigation or have any first-hand information about the probable-cause determination. *Id.* ¶ 15.

Initially, investigative alerts automatically expired in six months. *Id.* ¶ 8. This policy changed to an auditing process. *Id.* Instead of automatically expiring, investigative alerts would be audited every 28 days to purge alerts no longer needed. *Id.* ¶¶ 8, 19.[5] It was the responsibility of any BIS sergeant or above to ensure investigative alert requests were "updated or canceled as necessary" and that investigative alert files were audited every 28 days to ensure the requests on file were canceled when the subject had been apprehended or the alert was no longer needed. *Id.* ¶ 20; [301] ¶ 13. BIS detectives were also required to notify supervisors when an investigative alert needed to be updated or canceled. [301] ¶ 15.

In 2011, at the time of Taylor's arrest, thousands of investigative alerts were inputted into the system. *Id.* ¶ 17. The parties dispute whether any audits took place that year, [300] ¶ 21, but there were no records of any audit completed in 2011, no written criteria for performing audits, and no records demonstrating lieutenants were held accountable for conducting audits. *Id.* The department had started discussing better recordkeeping practices, like maintaining electronic, instead of paper, records. *Id.* ¶ 23. As of March 2019, there were hundreds, if not thousands, of open investigative alerts still in filing cabinets. *Id.* ¶ 26.

---

[5] The parties dispute the reason behind the policy change. [300] ¶ 19.

In Taylor's case, Detective Weitzman was the BIS member who inputted the investigative alert. *Id.* ¶ 35. While Weitzman did not have first-hand knowledge of Officer Hughes's probable-cause determination and was not involved in the investigation, Weitzman concluded there was probable cause to arrest because Taylor was a convicted felon, he was named in a search warrant, and a gun had been recovered from his apartment. *Id.* ¶¶ 33, 36. The alert was approved by a BIS supervisor, whom Weitzman did not know and also was not involved in Taylor's case. *Id.* ¶¶ 37–38. Weitzman's responsibility to cancel the alert is a matter of some dispute, *see* [231] at 24, but there is evidence that after Taylor was acquitted in November 2011, it was Weitzman's responsibility to cancel the alert. [300] ¶ 40; [301] ¶ 23. The following month, Taylor was arrested again on the same investigative alert. [301] ¶ 26. Another detective eventually canceled it. [231] at 23. Taylor has no other examples of arrests based on stale investigative alerts.

### III. Analysis

Taylor experienced a constitutional injury when he was seized without probable cause in December 2011, but more is required to hold the City liable under § 1983.

Municipalities are liable under § 1983 when they are directly responsible for the constitutional deprivation. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). A plaintiff must prove three elements: "(1) a municipal action, which can be an express policy, a widespread custom, or an act by an individual with policy-making authority; (2) culpability, meaning, at a minimum, deliberate conduct;

6

and (3) causation, which means the municipal action was the 'moving force' behind the constitutional injury." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 598 (7th Cir. 2019) (citing *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404–07 (1997)), *reh'g and suggestion for reh'g en banc denied* (Sept. 16, 2019). *Monell* does not subject municipalities to liability for the misconduct of employees under a theory of respondeat superior. *Ruiz-Cortez*, 931 F.3d at 599.

The apartment search and Taylor's June 2011 arrest were supported by probable cause to believe Taylor committed a crime and did not violate the Constitution, [231] at 10–23, which means Taylor cannot prove an essential element of a *Monell* claim based on the City's "John Doe" warrant and investigative alert policies. The City's motion for summary judgment on these two issues is granted.

That leaves Taylor's claim that his December 2011 detention was unconstitutional and caused by a municipal policy. One instance of an express policy causing a constitutional injury when enforced suffices to establish municipal liability. *Calhoun v. Ramsey*, 408 F.3d 375, 379–80 (7th Cir. 2005); *see also Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372 (7th Cir. 2017) (en banc), *cert. denied sub nom. Corr. Med. Servs., Inc. v. Glisson*, 138 S. Ct. 109 (2017). In contrast, an express policy that is constitutionally valid on its face but omits certain details, or an implied policy of inaction, is treated like a widespread custom or practice and requires more evidence than a single incident to establish culpability and causation between the omissions in the policy and the constitutional deprivation. *Calhoun*, 408 F.3d at 380 (citing *City*

*of Okla. v. Tuttle*, 471 U.S. 808, 824 (1985)).[6] This evidentiary requirement ensures the policy itself is the problem, not a random event. *Calhoun*, 408 F.3d at 380. If the municipality has acquiesced to the outcome of the policy multiple times, a jury could infer that the gaps in the policy caused the constitutional injury and the municipality acted with deliberate indifference. *Id.* Only under a narrow set of circumstances is evidence of one incident enough to justify the requisite inferences of culpability and causation: where a constitutional violation is a "highly predictable consequence" of the policy omission. *Id.* at 381 (citing *Brown*, 520 U.S. at 409–10).

Taylor argues that the investigative alert policy violates the Fourth Amendment's prohibition against warrantless arrests and is facially unconstitutional. But the Fourth Amendment permits warrantless arrests supported by probable cause, *United States v. Haldorson*, 941 F.3d 284, 290 (7th Cir. 2019), and under the policy, an investigative alert to arrest must be based on probable cause. [301] ¶ 11. The initial officer's probable-cause determination is then imputed to other CPD officers aware of the alert. Taylor argues that the collective knowledge doctrine applies to "police officers working closely together to rely on information *actually communicated.*" [294] at 10. But the doctrine also applies to police bulletins, when information from one jurisdiction is relayed to officers in another jurisdiction to

---

[6] The City argues that Taylor failed to show a widespread practice regarding investigative alerts. [288] at 11. Taylor counters that he is not alleging a widespread practice but rather a constitutional violation based on an express or implied policy theory. [303] at 13. According to Taylor, the CPD's policy was "so full of holes, lack of coordination, and lack of communication" that it led to Taylor's constitutional violation. *Id.* at 14. Because the legal analysis is the same for gaps in express policies as it is for widespread customs or practices, the distinction is immaterial.

coordinate investigations and apprehend fleeing suspects. *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005); *see also United States v. Hensley*, 469 U.S. 221, 231–33 (1985). The investigative alert system functions as a police bulletin broadcast within a jurisdiction. *See Banks v. Fuentes*, 545 F. App'x 518, 521 (7th Cir. 2013) ("Police officers may stop a vehicle based on a bulletin alone … . [T]he investigative alert authorized Banks's arrest because other officers already had made a determination of probable cause.") (internal citations omitted).[7]

Taylor argues "there is a missing link" that undermines the application of the collective knowledge doctrine when the BIS member or supervisor entering or approving the alert is not required to talk with the initial officer who found probable cause. [307] at 7. Yet the very purpose of the doctrine is to allow officers to impute their knowledge to others that lack firsthand information. *Parra*, 402 F.3d at 764. The probable cause to seize a person does not change based on how many people are in the chain of communication between the initial officer and the arresting one. Taylor does not argue that police bulletins can only be issued by dispatchers that actually communicate with the officer that determined probable cause, and offers no

---

[7] Federal Rule of Appellate Procedure 32.1 permits citation to unpublished cases like *Banks v. Fuentes*, 545 F. App'x 518 (7th Cir. 2013). Although not precedential, *see* U.S. Ct. of App. 7th Cir. Rule 32.1, *Banks* is correct—a detention triggered by an investigative alert based on probable cause to suspect an individual of a crime does not violate the Fourth Amendment, because the Constitution permits warrantless probable-cause arrests outside the home.

9

evidence that investigative alerts materially differ from police bulletins. The CPD's policy is not inherently unconstitutional.[8]

The policy to detain suspects based on probable cause was facially valid, but its auditing requirement was poorly implemented. The policy required cancellations of alerts and timely audits. [300] ¶ 20. But in 2011, there were thousands of investigative alerts, yet no record of any audits or a paper trail of accountability. [301] ¶ 17; [300] ¶ 21. As of March 2019, the CPD did not appear to have an electronic auditing system for the hundreds, if not thousands, of open investigative alerts. [300] ¶ 26. But this apparent sloppiness or incompetence cannot support municipal liability under § 1983 unless it caused a constitutional violation more than once. Taylor provides no other evidence of improper arrests based on stale investigative alerts besides his own. For policies that are facially constitutional but contain certain omissions, or amount to an implied policy of inaction, more than a single incident is required to establish municipal liability. *Calhoun*, 408 F.3d at 379–80. "[A] written policy that is facially constitutional, but fails to give detailed guidance that might have averted a constitutional violation by an employee, does not itself give rise to municipal liability." *Spiegel v. McClintic*, 916 F.3d 611, 618 (7th Cir.) (quoting *Szabla v. City of Brooklyn Park.*, 486 F.3d 385, 392 (8th Cir. 2007)), *cert. denied*, 140 S. Ct. 51 (2019). Nor was Taylor's injury a "highly predictable consequence" of the investigative alert policy, which would only require evidence of a single incident. Had

---

[8] An Illinois appellate court in *People v. Bass*, 2019 IL App (1st) 160640, held that Chicago's investigative alerts violate the Illinois Constitution, but its analysis rejected a federal constitutional prohibition on investigative alerts and is therefore irrelevant here.

10

the policy been followed as written, the alert on Taylor would have been cancelled, a fact Taylor concedes. [294] at 12. By failing to offer any other examples of improper arrests, Taylor lacks sufficient evidence to infer the policy itself demonstrated deliberate indifference to his rights or caused his constitutional injury.[9] The investigative alert policy required probable cause and timely audits to prevent unjustified seizures. The policy complied with the Fourth Amendment. At best, the evidence demonstrates one instance of a policy violation. Taylor cannot carry his burden of proof at trial to hold the City liable under § 1983.

IV. **Conclusion**

The City's motion for summary judgment [287] is granted, and Taylor's [290] is denied. Plaintiff's counsel's explanation for why additional sanctions should not be imposed for violating the limits on the number of pages and facts shall be filed by January 22, 2020. A status hearing to discuss the remaining claim is set for January 30, 2020, at 9:30 a.m.

ENTER:

                                                         Manish S. Shah
                                                       United States District Judge

Date: January 8, 2020

---

[9] Irrespective of Weitzman's potential individual liability, *see Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010), Taylor established that he suffered a constitutional violation when he was arrested without probable cause (or a warrant) in December 2011. The reasonableness of the arresting officers is irrelevant because there was no probable cause to arrest Taylor for possession of a gun after his acquittal.